Good afternoon, my name is Deborah Bigby and I represent the appellant, Mr. Meraz-Campos. Mr. Meraz-Campos was denied the opportunity to present his defense of duress to the jury because the trial court improperly concluded that he had failed to proffer sufficient evidence of the first element of duress, which is an immediate threat of death or serious bodily injury. However, given the severe beating the cartel inflicted on Mr. Meraz-Campos in August of 2018, as well as the cartel's threats that the purpose of the beating was to ensure compliance with future directives, there can be no doubt that Mr. Meraz-Campos sufficiently proffered that he was under an immediate threat of death or serious bodily injury on September 19th, the date that two members of the cartel entered the residence he shared with his wife and children, stripped him of his personal cell phone, and ordered him to drive a truck containing 72 pounds of contraband to Phoenix. I submit that at that point in time, Mr. Meraz-Campos knew that serious bodily injury to him and his family would be the specific and direct consequences of him failing to obey the cartel's order. Ms. Bigby, can I ask you a question on this immediate threat? Is it your position that Mr. Meraz-Campos faced an immediate threat based only on the events on the day of his arrest, or are you arguing that the abduction and beating a month before the arrest contributed to the immediate threat? I think that the events before the date of his arrest, I think they put some teeth into the fact that on the day they showed up and ordered him to drive to Phoenix with the contraband, he knew that they were serious, he knew what would happen to him. The threat was specific in that he had, I think I detailed the beating in the brief, but he knew what was going to happen to him if he failed to obey the order, and I believe that he thought it would be a specific and direct consequence to him and his family. I hope that answers your question. Counsel, if Mr. Meraz-Campos had successfully exited the port of entry and gone on to Phoenix, and then somehow been picked up in Phoenix, would he still have this defense? Having encountered, let's suppose that they went through secondary and somehow didn't bring the dog around, the dog was not available, not feeling well that day, and they said, okay, looks okay, go on, and then he gets picked up in Phoenix, does he still have the same argument, same defense? I think he would, only because the cartel had also told him that his family was in danger, and I know that in three separate instances, when he was meeting with Officer Ochoa, he mentioned, my family's at risk, I'm really worried about my family, and at one point he said to him, will you help me take the truck to Phoenix because they have my family. And so I think with respect to the issue about his family also being in danger, I think that he would. So we could affirm on any basis in the record, and there are three parts to his duress defense, and you're focusing on the immediacy of the threat. What about the opportunity to escape? Now I understand your argument that he didn't have an opportunity to escape because he walked through the port of entry, tried to enter a pedestrian entry, and an officer did not listen to his concerns, but the initial encounter or abduction was 32 days before the day he attempted to cross the border, and even if a member of the cartel was riding the vehicle with him until he got close to the port of entry, he then entered the port of entry by himself in the vehicle loaded with a pretty significant amount of drugs, I don't remember what it was, and didn't say anything to any of the officers until the drugs were detected. So why doesn't that count as an opportunity to escape? I guess my point is that at any point in 32 days he could have gone there again, or the day that he was crossing the border he could have told the agents before they detected the drugs. Well I think that this court's decision in United States v. Lopez talks about the fact that the third element is lack of a reasonable opportunity to escape, and you have to assess reasonableness in terms, you have to take all the particulars of the defendant, when you're looking at that reasonableness inquiry, and he noted, he stated when he was narrating the video in court, that immediately after he came into America he turned around and went back to Mexico, and he said because the cartel had been watching me, and if they had seen that I wasn't there, they would have hit me, and they had already hit me, that's almost like a direct quote of what he said. And so I think when you look at this you have to say, well there could have been certain circumstances, dealing with this defendant, like it might have been more dangerous for him to attempt to go to the POE again, or the fact that he had a family back in Mexico, and to argue that he should have to be displaced, and move to another country, pick up his family, there's just different particulars, and I think, again, he didn't get to present the defense, but I think that's a jury question, as to whether the reasonableness of considering this defendant, and all the particulars that go along with him, and as to whether he really had an opportunity to escape during that time period. Ms. Bigby, in some cases, I guess we have held that the failure to report to local authorities defeats, or could defeat a defendant's argument that he lacked a reasonable opportunity to escape the harm. Was there any evidence of that here by Mr. Morales Campos, and should that affect our decision on the escape? There was no evidence in the record that he attempted to contact the Mexican police or anything, but I think that it's important that he did try to go to the Customs and Border Patrol officers, because that is where, once he crossed over, that is when the crime would occur. And again, I think that you have to look at the particulars of the defendant that you're involved with here, and the involvement of the cartels and maybe the local police, before you can really make that determination. And I would assume that would be something the government would want to cross-examine him on, or he might want to present an expert on, if this defense had gone to the jury, and it would be appropriate for the jury to decide that. I'm sorry, go ahead. Go ahead, Judge Brady. I didn't want to take up too much of Ms. Bigby's time. I realize she probably wanted to reserve a little bit for rebuttal. But guess what that suggests, is there are three scenarios when your client approaches the port of entry. Either he successfully crossed with the drugs and delivered them to Phoenix, he alerted the Border Patrol agents to what was secreted within the vehicle, and they seized the vehicle and did something with him, maybe took him into protective custody. Or what would be the third option? He doesn't tell anybody, he gets caught, and then he's facing prosecution. So I recognize that none of those are good options for him if his duress events are true, but it seems like he did have an opportunity to escape, and telling somebody before you face prosecution and significant criminal exposure is better than what he did, which was just to try to get through the border with the drugs. I mean, I guess I understand your reasonableness argument, but I don't know how that means it's not a reasonable opportunity to escape. Well, I mean, like I said, I think you have to look at the particulars of the defendant and whether it was safe. He considered that it was safe to go back and try again to talk to the Border Patrol. Also, the fact that the member of the cartel got out right at the border, I've got to believe that if they had 72 pounds of drugs in the Jeep, that that person is going to be watching and making sure that he doesn't take a U-turn or go off on a dirt road. And so until he got to the port of entry, that was really, I guess, the last opportunity. Well, I mean, I'm not suggesting he escaped by taking a U-turn and circumventing the border. Once he pulls into the border, if the cartel were still able to observe him and they see him sent into secondary and the vehicle searched, they know the game's up, that the drugs have been seized. And if he told the agents that there were drugs in the vehicle, the same thing would have happened. It would have been, he would have gone into secondary, the vehicle would have been seized. So I don't know how that defeats his opportunity for escape. Well, again, the family was still at risk and the family was still back in Mexico. So I think that was still on his mind. And maybe a lack of a reasonable opportunity to escape didn't enter his mind because of that. So there seems to be some questions to whether his family actually was in Mexico, whether they were in California. I would like to respond to that because I know the government mentioned it. And first of all, the trial court couldn't really look at that because they have to accept the proper as true. But more importantly, the family was noted to be in California. When that happened, when he said they were in California, it was a year after when he was talking to the pre-sentence. It was a year after the crime. When he was talking to the pre-sentence report person, they say they have another witness that confirmed that he said that too. At the time, I have not been able to find that name anywhere on the record. At the time he talked to Officer Ochoa, he said, where does your wife live? And he said, same as me, Chupas, 2221 Chupas. Thank you, Ms. Bigby. Okay, thank you. Some time for rebuttal. Oh, thanks. Please proceed. Good afternoon, Your Honors. My name is Bruce Van Baron. I represent the United States in this case. May it please the court. This court should affirm Mr. Maras-Campos' conviction for drug trafficking and importation of drugs, as well as his 121-month sentence. With respect to the first question presented on appeal, the district court correctly precluded Mr. Maras-Campos from presenting evidence of a duress defense to the jury at trial because he cannot establish the first or the third prongs of this court's three-part test for a prima facie case of duress. With respect to the third prong, the record shows that Mr. Maras-Campos had multiple reasonable opportunities to escape the threatened harm for two reasons. First, on the day of his offense, Mr. Maras-Campos could have escaped any threatened harm that he felt he was under by alerting the Customs Border Protection officers in primary inspection, as well as in secondary inspection, of the harm he faced. He did not do that. Instead, he waited to see if the drugs could go through the port of entry, and he waited until after they were discovered and he was caught to come clean to the HSI agent. Counsel, we have said in some prior cases, one of them is the clock case, the Chinese guy trying to get sophisticated equipment into the United States. Or out of the United States into China. That he did was not under an obligation to turn himself in as soon as he got to a port of entry, which I think was Atlanta, because he knew that there were agents in China who knew where his family was, who had made very specific threats and were watching them and tracking them. And that had occurred over a period of years, not just over an immediate period. So although he, although Mr. Maras may have had an opportunity to escape, to avoid for himself, knowing that his family was still in Mexico and threatened by the cartel, how do we, how do we, how do we deal with that under prong three? Sure, Judge, two points. First, I just want to make clear that with respect to himself, this court has made crystal clear in the Abaro penal case that he did have to turn himself in. And he did have to alert the officers in primary and secondary inspection, as Judge Beatty pointed out, to the harm he was under. By not doing that, that forecloses his, his defense, his duress defense, because he cannot meet the third prong of the prima facie case because of that. With respect to his family, Mr. Maras Campos did not proffer any facts about his family being caught in Mexico or under some sort of surveillance or not safe in Mexico to the district court. The claim now on appeal that they apparently had his family and his family in Mexico with all due respect to counsel for Mr. Maras Campos, that is belied by the record. I would point the court to supplemental excerpts of record nine where the government proffered that he told the custom border protection officer during his immigration interview that his wife and children were in Fullerton, California. Now we proffered that. It's also in the record, the actual immigration form questioned by question and answer verbatim at clerk's record 46-2, which is filed under seal in the district court. The question there, the CBP officer asked him, and this is immediately after he is arrested on September 19, 2018, quote, question, where do your wife and children live? Answer, they all live in Fullerton, California. And then the second place in the record is in the PSR at page seven, where he told his the the he told the probation office that his wife, his kids and his three living siblings all lived in California. So there is no evidence in the record that Mr. Maris Campos's family actually lived in Mexico. And because they were not in Mexico where the cartel members were, they were in California. This does not this does not change the fact that he Mr. Maris Campos had a reasonable opportunity to escape. So that's what distinguishes this case from the Chaitung case, where he could not turn himself into U.S. authorities because the U.S. authorities there could not protect his family members from the Chinese government back in China. Your Honor, I your honors, I would point to the second reason why Mr. Maris Campos cannot meet the reasonable opportunity to escape prong of the three part test is because in the weeks leading up to his arrest, he left Mexico, entered the United States and returned to Mexico where the cartel members were on three occasions. And that's that excerpts of record 131 on September 9, on September 4, 2018, September 7, 2018 and September 15, 2018. Again, under this court's decision in a barro Pino, those encounters with custom border protection. It constitute reasonable opportunities to escape. The court asked counsel about, well, what about Mexican authorities? And and she suggested that the government would want to cross examine. But the defendant here had to come forth with a prima facie showing of duress. And one of those elements is that he had, quote, no reasonable opportunity to escape. The record is clear that he had multiple opportunities to escape the threatened harm. And for those reasons, under this court's decision in a barro Pino, he cannot get past the third prong of the three part test. Your Honor, you were you were you were down below. The focus was on the first element of the prima facie case. You seem to be focused now on the escape. Is that is that right? So you disagree with the district court? Yes, Your Honor. Yes, Your Honor. And the two are are closely, closely related. For example, in the barro Pino case, the district court said, well, there was no immediate threat because you had these opportunities to escape. And what this court did on appeal was say, OK, we're going to analyze that under the reasonable opportunity to escape from rather than the immediacy prompt. And the reason why we focus on this on appeal is because it's so close to the barro Pino case that the fact of the matter is, Mr. Maris Campos cannot get around this court's binding decision on that issue. And as Judge Beatty pointed out, this court held that it can affirm the district court's ruling on any basis in the record. And so, yes, we would disagree with the district court's finding that he met the prima facie case with respect to the third prong. And we would ask this court to find that he did not and he cannot under the barro Pino case. Counsel, would you I just want to take you back to the question about where his family was. I wrote down some of the citations. I'm not sure I got them all down. Could you give me the citations in the record where he told the officer? Sure. So. The supplemental excerpts of record at nine is where the government proffered that the office of what the officer would testify to in response to Mr. submission to the court with that document. And what what is that document? So the document is a form eight I eight seventy seven. And essentially, after Mr. Maris Campos was interviewed by Officer Ochoa of the HSI, this post Miranda interview, he also had an interview with the custom border protection officer. And there they went through a number of questions with regard to his immigration status. And that's where the verbatim where do your wife and children live? They all live in Fullerton, California. Question and answer came from. Can I ask you about I know you have a lot of reliance, a place, a lot of reliance on our barro Pino. But I guess I just want to ask you, because in a barro Pino, the defendant there had family in law enforcement in Mexico. And couldn't explain why he never tried to contact either Mexican or U.S. authorities. And it also seems that at least based on my review, he sought to mislead authorities at both primary and secondary inspection and took like 30 or 45 minutes of interviews to bring up the threat. And also in a barro Pino, he was allowed to present parts of his jurist defense and evidence at trial, but he didn't get a jurist jury instruction. So I'm trying to see how that helps you with those distinguishing factors. Sure. So I'll take the last one first, because I think it's important. The court there explained that the district court record was really unclear because there was a pretrial ruling where the proffer was prevented. He didn't profit. And you're right. Some testimony did come and there was a discussion about, well, that related to his state of mind. It wasn't really related to duress. So what the court did there is it said, we're going to assume that he was not permitted to present this evidence. We're going to assume that was true and that he wasn't allowed to present duress. And that was proper is what the court held. And so because of that, it really is directly on point. Now, then the concurrence of concurring opinion in a bar, you know, one of the judges says, yeah, I disagree. He was allowed to present a duress defense because some of this testimony did come in. And so I think that kind of cleaning that up shows that a bar up is directly on point. And with respect to the Mexican law enforcement in his family, I think that helps us here, too, as well, because he did not proffer that. He couldn't have alerted Mexican authorities on his way out of the United States three times that he was under threat. He never proffered that the Mexican authorities were corrupt and he couldn't go to them, such as happened in Chaitan Coop and Contento Patron. And those two decisions, they had to put forth that evidence. I'm sorry to interrupt you, but didn't you say, I mean, how is that? I mean, he felt like he was under this direct threat from from the cartel people going to Mexican authorities. At what time? I guess I'm just trying to figure out. Are you saying that he should have approached the Mexican authorities when if he goes to any authority? It sounds like he feels like his life or his family's life is in danger. Well, this court has in the cases like Chaitan Coop and Contento Patron, where it has found that he met the duress prima facie case. The court has said at the first available, the first reasonable opportunity to do so, he he had to do that. And so, for example, when the individual got off the plane, his first available opportunity to alert authorities was to consent to a body scan that revealed the drugs. And so he has to take every reasonable opportunity. It's his burden to put forth evidence. The question is reasonable, because once somebody gets off the plane, I can see here. I think, you know, kind of the focus has been on leading up to that point where he gets caught and, you know, or has an opportunity to reasonably tell what's going on with the whole idea of the threat. It just seems like the prima facie standard is so low here that, you know, just saying, hey, on its face, this seems like he may have met this. And so why doesn't he get the opportunity to present that as a defense? I mean, whether I mean, whether he's going to be successful or not, I'm not sure. But here we kind of we're saying you don't even get that opportunity. It just seems like it's a it's a pretty close question here. In this court's rationale for establishing the test was and again, the court established this test that he has to meet this test and instructed district courts. If he does not meet this test, you have to exclude this evidence. And the reason for that test is because otherwise any defendant can just throw any sort of claim of fear, no matter how vague, no matter what lack of specificity out there to the jury. And the district court is the gatekeeper to ensure that the evidence that would come in is relevant. And if it comes in, it could establish the preponderance of the evidence standard that of duress. And if that isn't there, then it should not go to the jury because it would only serve to conserve to confuse your honors. I see that I'm out of time. So unless I unless you have any further questions, I would ask the court to affirm Mr. Maris Campbell's conviction and sentence. Thank you, your honors. Thank you, Mr. Van Buren. Bigby looks like we went four minutes over with Mr. Van Buren. And I think we went a minute over with you, but I'll give you three. OK, great. Thanks. Yeah. With respect to, you know, Judge Beatty, I was thinking about your question again. And I guess my answer is, well, he didn't go. It's sort of can't really make your decision based on what his options were here because what happened happened. And that's the case that we're faced with. But the other point I wanted to make is that the a lot of the facts that the government is referring to are simply things that the trial court was not permitted to look at. He's supposed to take the proffer true in its entirety. And so the fact that he he may have been out of Mexico three times. I know one time he went out to cross an empty truck for them at their request. But I just don't think you can look at that at those types of things. Now, about the family, I wanted to make sure that you knew that it's excerpts of record pages 146 and 147. And that's where Officer Ochoa asks him, are you married? Who's your wife? Where does she live? He said, same place as me goes through the kids on those two pages. And whether he told the other officer something distinct right afterwards is is, again, it's something that could be brought up by the government if it didn't. And Ochoa didn't ask him where his family was. It simply said, OK, let's let's take let's take the kids. Give me their names. They went through the spelling of Scarlett's name because it presented some linguistic challenges for them as they were taking the transcription. So there's no Ochoa never asked them. Where are they? Well, he did for the wife. He said what he said. And then he said her address. And the defendant said, same as mine, Calahoun, Chiapas. And so an address is not is not where you're physically located. And so if she was physically located in California and that was sort of her legal address, that that doesn't tell us where the family is. And if the family's in California, I have to say that might make a difference for me in this case, because I think this is I think this is a close case. Yeah, it is. But I just want to make sure you knew that's where I was getting that from. And he did say to Officer Ochoa, they have my family. That's at that's at. He said a couple of times. Excerpt record 173. I'm worried about my family. My family is under threat. And then he finally he asked Officer Ochoa, can you just help me take the truck to Phoenix? Because, quote, they have my family. That's a 162 and 163. And that's why I believe that the family was in Mexico. But if there was some other evidence that the governor had, I think if the defense came in, that would be something they could question him about. Why did you say this? Thank you. Before before you end, I just wanted you to give you a chance to to respond to Ibarra Pino case because the government seems to rely heavily on it. Uh huh. I guess when I was reading the cases, I thought Ibarra Pino was was important for all the reasons you stated. The cases that I thought this situation were most like were United States versus Quok, where they were giving him directives and he was responding. And and it was kind of a continuing situation. And also contentional patch on because, like you said, the you know, he came in, but he didn't. There is no requirement in the Ninth Circuit that once you reach a place of safety, you have to disclose what you've done, except I think in prison escape cases there is. But so I think Ibarra was important. It is a close case, but I really do think that if if he if if his proper is taken as true as it's supposed to be, that he should get that opportunity to go before the jury. And there's a lot of things the government can say that might poke holes in his story. But. I think that he met the threshold. Maybe barely, but. All right. All right. Thank you very much. OK, thank you. Thank you. Both appreciate your oral argument presentations here today. Mr. Barron.
judges: Bybee, Murguia, Bade